1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   TEREZA CAMPOS BRAVO,              Case No. CV 16-5741 SS

12              Plaintiff,

13        v.                           **MEMORANDUM DECISION AND ORDER**

14   NANCY A. BERRYHILL, Acting
     Commissioner of Social
15   Security,[1]

16              Defendant.

17

18                                **I.**

19                           **INTRODUCTION**

20

21        Tereza Campos Bravo ("Plaintiff") brings this action seeking

22   to overturn the decision by the Commissioner of the Social Security

23   Administration (hereinafter the "Commissioner" or the "Agency")

24   denying her application for Supplemental Security Income ("SSI").

25   The parties consented, pursuant to 28 U.S.C. § 636, to the

26   jurisdiction of the undersigned United States Magistrate Judge.

27   [1] Nancy A. Berryhill, Acting Commissioner of Social Security, is
     substituted for her predecessor Carolyn W. Colvin, whom Plaintiff
28   named in the Complaint.  See Fed. R. Civ. P. 25(d).

For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff filed for Supplemental Security Income ("SSI") benefits on April 3, 2013. (AR 140-48). After the application was denied, (AR 66-71), Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 75). The ALJ held hearings on October 21, 2014, (AR 41-53), and February 18, 2015. (AR 22-40). On March 19, 2015, the ALJ issued an unfavorable decision. (AR 7-21). The Appeals Council denied review on June 29, 2016. (AR 1-4). This action followed on August 2, 2016.

## A.   Plaintiff's History And Adult Function Report

Plaintiff was born on August 11, 1953. (AR 54). She was slightly more than fifty-seven and a half years old at the time of her alleged disability onset date of April 18, 2011. (Id.). At the time she filed for disability benefits, Plaintiff lived with her children in an apartment where she cooked, shopped and did house chores. (AR 58, 141, 172-73). Plaintiff previously worked as a cashier, (AR 48), and as a yard supervisor "watching kids." (AR 49, 191-93). She is clinically obese. (AR 14). Plaintiff

\\

\\

\\

alleges that she suffers from back pain, sciatica, arthritis, and depression.[2] (AR 46, 54, 188).

In an Adult Function Report dated May 29, 2013, Plaintiff states that she suffers pain in her back, legs and hands. (AR 179). According to Plaintiff, she experiences "very painful spasms in [her] lower back" and pain in her "knees, hips, hands, [and] ankles." (Id.).[3] Plaintiff admits that gets up to feed her dog. (AR 180). She also does "a little cleaning," her "own laundry," and waters the grass and plants. (Id.). Plaintiff further states that she goes shopping "once or twice a week as needed" to purchase "food, shampoo, toilet paper, dish soap, toothpaste." (AR 182). Plaintiff reported that she takes the following prescription medication: Ibuprofen (pain), Pravastatin (cholesterol), Bupropion (depression), Hydrochlorothiazide (hypertension), and Atenolol (hypertension). (AR 186).

---

[2] The ALJ thoroughly addressed the medical evidence relating to Plaintiff's purported depression and concluded that her "medically determinable mental impairments cause no more than 'mild' limitation" and are "nonsevere." (AR 13). Both Plaintiff and Defendant have stipulated that the ALJ "fairly and accurately" summarized the medical evidence in the Administrative Record (except to the extent specifically disputed by Plaintiff). (Plaintiff's Memorandum in Support of Complaint ("P Memo.") at 2; Defendant's Memorandum in Support of Answer ("D Memo.") at 2). Because neither party claims that Plaintiff's entitlement to SSI benefits depends in any degree on her purported mental impairment, the Court will not address the treatment Plaintiff received for her depression in summarizing Plaintiff's medical history.

[3] In contrast to her Adult Function Report, Plaintiff stated in her SSI Application, filed approximately six weeks prior to the Application, that she "do[es] not need help in personal care, hygiene or upkeep of a home." (AR 142).

3

## B.   Plaintiff's Testimony

Plaintiff testified that she suffers constant pain "everywhere," but mostly in her back and down through her legs. (AR 46).  The pain prevents her from being able to stand or sit for long periods.  (Id.).  "Standing hurts too," so Plaintiff has to keep "moving a little bit."  (AR 47).  She can stand or walk for fifteen minutes before she needs to lie down again.  (AR 48).

Plaintiff testified at the October 21, 2014 hearing that after filing for benefits, she moved in with her brother "for financial reasons," where she continues to do "housework," although it may take her a full day to clean "one little room."  (AR 51-52).  At the February 18, 2015 hearing, Plaintiff stated that she "just had to move out of Lancaster[,] so on cold days, [she's] hurting," and on hot days, "there's more inflammation" and "more aching."  (AR 33).

## C.   Third Party Adult Function Report

On May 29, 2013, Plaintiff's daughter completed a Third Party Adult Function Report that closely mirrors the Report completed by her mother on the same date.  The Report states that Plaintiff "is in constant pain[,] which keeps her from getting things done" and from sleeping.  (AR 170-71).  Plaintiff "can't do lifting, bending over, or a lot of standing."  (AR 171).  Plaintiff's daughter states that she must help her mother get dressed.  (Id.).  However, Plaintiff can cook meals "that can be cooked in the oven or

microwave," and is able to do "laundry & washing dishes."  (AR
172).  Plaintiff also goes shopping for food and toiletries,
typically for two hours every couple of weeks.  (AR 173).

**D.   <u>Treating Physicians</u>**

     The medical records from Plaintiff's primary care provider,
the Venice Family Clinic ("VFC"), reflect that Plaintiff sought
treatment for various ailments between July 23, 2012 and August
29, 2014 on twelve occasions.[4]  The first three of these visits
pre-date the filing of Plaintiff's SSI Application in April 2013.
Dr. Tarin Molly Koehler, D.O. is listed as Plaintiff's treating
physician for each of these visits, with the exceptions of the June
25, 2013 and July 29, 2013 consults, which identify Dr. Analiza
Sanchez, M.D. as the provider.  (AR 322, 325).

     The VFC records for the three visits before Plaintiff filed
for SSI benefits -- for July 23, 2012, February 21, 2013, and March
21, 2013 -- reflect that Plaintiff presented with complaints of
hypertension, (AR 242, 245 and 248), but do not reflect any
complaints of back pain.  (AR 242-51).  Each of these pre-SSI
filing medical records lists Plaintiff's four "chronic problems"
as hypertension, hyperlipidemia,[5] depression, and GERD, again

---

[4] The dates of the visits are:  7/23/12 (AR 248-51); 2/21/13 (AR
245-47); 3/21/13 (AR 242-44); 5/3/13 (AR 239-41); 6/25/13 (AR 323-
27); 7/29/13 (AR 319-22); 10/21/13 (AR 315-18); 11/04/13 (AR 308-
11); 11/20/13 (AR 302-04); 1/22/14 (AR 292-95); 2/24/14 (AR 287-
90); 8/29/14 (AR 283-86).

[5] Hyperlipidemia is "the presence of excess fat or lipids in the
blood."      (<u>See</u>    http://c.merriam-webster.com/medlineplus/
hyperlipidemia.)

without mention of back pain.[6]  (AR 242, 245 and 248).  During the July 2012 visit, Plaintiff complained of "pain in joint involving ankle and foot," for which Dr. Koehler prescribed Ibuprofen.  (AR 250).  However, that complaint was not renewed in the February or March 2013 visits.

The VFC record for May 13, 2013, the first visit after Plaintiff filed for SSI benefits, reflects that Plaintiff for the first time presented with complaints of "persistent" back pain, which she claimed had begun two years earlier.  (AR 239).  The May 2013 visit is also the first of only two times out of all twelve recorded VFC visits that Plaintiff is documented as presenting with an "antalgic" gait.[7]  However, the May 2013 record further notes that Plaintiff's "straight leg raise" test, which determines whether a patient with low back pain has an underlying herniated disk, was negative.[8]  According to Plaintiff, the pain in her back

---

[6] GERD stands for "gastroesophageal reflux disease."  (See http://c.merriam-webster.com/medlineplus/gastroesophageal +reflux+disease.)

[7] An "antalgic" gait is "marked by or being an unnatural position or movement assumed by someone to minimize or alleviate pain or discomfort (as in the leg or back)."  (See https://www.merriam-webster.com/medical/antalgic).

[8] The Straight Leg Raise ("SLR") test "is a neural tension test that can be used to rule in or out neural tissue involvement as a result of a space occupying lesion, often a lumbar disc herniation."  (See http://www.physio-pedia.com/Straight_Leg_ Raise_Test).  During the test, "the patient is positioned in supine without a pillow under his/her head, the hip [is] medially rotated and adducted, and the knee [is] extended.  The clinician lifts the patient's leg by the posterior ankle while keeping the knee in a fully extended position.  The clinician continues to lift the patient's leg by flexing at the hip until the patient complains of pain or tightness in the back or back of the leg."  (Id.).

was a sharp ache, and was relieved by movement and stretching. (Id.). The records for this visit reflect that Plaintiff declined a "PT [physical therapist] or Ortho referral at this time." (AR 241). Dr. Koehler "encourage[d] gentle ROM exercises and conservative therapy." (Id.). As with the prior records, the May 2013 record identifies Plaintiff's four "chronic problems" as hypertension, hyperlipidemia, depression, and GERD. (AR 239).

On June 11, 2013, an x-ray revealed that Plaintiff had "mild anterolisthesis[9] of L4 on L5 by approximately 10% of the vertebral body length and likely bilateral spondylolysis. L4-5 and L5-S1 facet arthrosis[10] is likely. There is loss of disc height at the L5-S1 level which is mild. There is mild generalized osteopenia."[11] (AR 337).

Beginning with the June 25, 2013 visit and consistently thereafter, the VFC records add "lumbago" to the list of

---

[9] "Anterolisthesis is a spine condition in which the upper vertebral body, the drum-shaped area in front of each vertebrae, slips forward onto the vertebra below. The amount of slippage is graded on a scale from 1 to 4. Grade 1 is mild (less than 25% slippage), while grade 4 is severe (greater than 75% slippage)." (See https://www.spine-health.com/glossary/anterolisthesis). Anterolisthesis "is basically another term for spondylolisthesis." Id.

[10] Arthrosis is "an articulation or line of juncture between bones." (See http://c.merriam-webster.com/medlineplus/arthrosis).

[11] Osteopenia is a "reduction in bone volume to below normal levels especially due to inadequate replacement of bone lost to normal lysis," i.e., the normal process of disintegration. (See http://c.merriam-webster.com/medlineplus/osteopenia).

Plaintiff's "chronic problems."[12]    (AR 283, 287, 292, 302, 308, 315, 319, 323).   However, with the sole exception of the July 29, 2013 visit, (AR 319), none of the post-May 2013 records reflect that Plaintiff "presented with" back pain, although she may have discussed back pain with her provider during the visit.   (See AR 323 (6/25/13 visit, presented with depression and for follow up on lab tests); AR 315 (10/21/13 visit, follow up on lab tests and hyptertension); AR 308 (11/4/13 visit, cough and hypertension); AR 302 (11/20/13 visit, hypertension); AR 292 (1/22/14 visit, hypertension); AR 287 (2/24/14 visit, women progress note and hypertension); and AR 283 (8/29/14 visit, hyperlipidemia and hypertension)).

On June 25, 2013, Dr. Sanchez discussed treatment options with Plaintiff for her lumbago, including acupuncture, physical therapy and "ortho."   (AR 325).   Dr. Sanchez referred Plaintiff to acupuncture after Plaintiff indicated that that was her preference among the options.   (Id.).   Plaintiff was also advised to continue NSAIDs (nonsteroidal anti-inflammatory drugs, such as Ibuprofen). (Id.).   On July 29, 2013, Dr. Sanchez noted that although Plaintiff had been referred to acupuncture, she had not yet heard about the status of the referral.   (AR 319).   Treatment for lumbago continued to be a follow-up on the referral to acupuncture, and "NSAIDs or tylenol for pain."   (AR 321).   On October 21, 2013, Dr. Koehler noted that a VFC coordinator needed to "help reschedule"

---

[12] "Lumbago" generally refers to pain in the lower back and can be either acute or chronic.   (See http://c.merriam-webster.com/medlineplus/lumbago).

Plaintiff's acupuncture appointments because Plaintiff had missed the initial appointments. (AR 317). Dr. Koehler prescribed "home exercises" and "weight loss" to treat the lumbago. (Id.).

There does not appear to be any reference to treatment for Plaintiff's lumbago in the records for her November 3, 2013 VFC visit. (AR 308-11). However, an attached record reflects that Plaintiff visited an acupuncture clinic on October 22, 2013, the day after her prior VFC visit. (AR 314). On November 20, 2013, Dr. Koehler noted that Plaintiff was "getting some relief w/acupuncture," and consequently, Dr. Koehler elected to "defer Cpain referral for now."[13] (AR 304). On January 22, 2014, Dr. Koehler noted that Plaintiff continued to experience "some relief w/acupuncture." (AR 294). However, Dr. Koehler also noted that VFC should refer Plaintiff to "Cpain clinic via insurance once insurance status confirmed." (Id.). On February 24, 2014, Dr. Koehler elected to "hold [off] on Cpain referral until [Plaintiff] has reliable transportation (per [Plaintiff's] request)." (AR 289). Although the precise dates of the acupuncture sessions are somewhat obscured as presented in the Administrative Record, it appears that between October 22, 2013 and January 28, 2014, inclusive, Plaintiff received acupuncture treatment approximately eleven times. (AR 291, 296-301, 305-07, 314).

---

[13] The records do not clearly explain what "Cpain" stands for in Dr. Koehler's notes. However, CPAIN in the healthcare context may refer to an "electronic clinical pain assessment and tracking tool." (See http://www.dvcipm.org/pain-research/studies/program-evaluation-of-the-implementation-of-cpain-an-electronic-clinical-pain-assessment-and-tracking-tool-in-two-primary-care-warrior-transition-clinics).

Finally, on August 29, 2014, Dr. Koehler specifically noted that Plaintiff was "applying for SSI" but continued to experience "improvement w/conservative therapy [for her lumbago], will cont[inue] w/new clinic." (AR 285). Dr. Koehler also observed, for only the second time in the record, that Plaintiff's gait was antalgic. (Id.). Also on August 29, 2014, Dr. Koehler completed a Medical Opinion form in connection with Plaintiff's SSI claim in which she stated that Plaintiff had chronic low back pain and opined that Plaintiff could lift and carry 10 pounds occasionally; less than 10 pounds frequently; sit for 15 minutes at a time and for about four hours in an eight-hour day; stand and walk for 15 minutes each and for less than two hours in an eight-hour day; had to alternate at will between sitting and standing/walking; had to lie down at unpredictable times but as often as every hour; could occasionally twist, crouch, and climb stairs; could never stoop or climb ladders; had environmental limitations; and would miss more than three days of work a month (AR 339-41). Dr. Koehler further stated that the assessed limitations on Plaintiff's ability to do work-related activities were supported by Plaintiff's back spasms, her limited back range of motion, and her June 2013 lumbar spine x-ray, which revealed anterolisthesis at L4-5 and facet arthrosis with a loss of disc height at L5-S1. (AR 340). Dr. Koehler noted, however, that Plaintiff did not use an ambulatory device and reported some relief with acupuncture. (AR 341).

**E.    Consultative Examination**

     On September 6, 2013, Board-certified internist Dr. Soheila Benrazavi, M.D., conducted a consultative examination.   (AR 15, 271-76).  Accordingly to Dr. Benrazavi, Plaintiff stated that "she thinks that maybe she has arthritis," that the "pain radiates everywhere to the body," and is "worse with walking, standing and sitting."  (AR 272).  Plaintiff listed the drugs she was taking as "Ibuprofen, ranitidine, hydrochlorothiazide, lisinopril, atenolol, pravastatin, and bupropion."[14]   (Id.).   Dr. Benrazavi recorded Plaintiff's height as 5'1" and her weight as 187 pounds without shoes.  (Id.).

     Dr. Benrazavi performed a straight leg raise test, which was "negative at 90 degrees."  (AR 273).  Dr. Benrazavi also noted that Plaintiff had "[f]orward flexion 45° with pain otherwise normal." (Id.).  With respect to Plaintiff's hands, Dr. Benrazavi observed "[v]ery mild osteoarthritic changes . . . in the area of the right and left fifth digit DIP joints and very small ones on the right hand at the DIP joint of the middle finger."  (AR 274).  However, Plaintiff was "able to make a full fist bilaterally" and there was no swelling or any other joint deformity.  (Id.).  The range of motion was normal bilaterally in Plaintiff's knees, without any swelling, heat, redness or effusion.  (Id.).  Plaintiff's ankles

---

[14] Ranitidine is an "antihistamine that is administered . . . to inhibit gastric acid secretion."   (See http://c.merriam-webster.com/medlineplus/ranitidine).  Lisinopril is taken to treat hypertension.   (See http://c.merriam-webster.com/medlineplus/lisinopril).

also had a normal bilateral range of motion. (Id.). Dr. Benrazavi's examination of Plaintiff's lumbar spine "showed mild to moderate diminution in range of motion with pain without any evidence of lumbar radiculopathy[15]. . . . Reflexes were symmetric and power was full." (AR 275).

On the basis of these objective findings, Dr. Benrazavi concluded that Plaintiff was "able to lift and carry 50 pounds occasionally, and 25 pounds frequently, stand and walk for six hours per eight-hour workday, and sit for six hours out of an eight-hour workday." (Id.). Dr. Benrazavi further found that Plaintiff did not have any "postural, manipulative, visual, communicative or workplace environment limitations." (AR 276).

**F.    Non-Examining Physicians**

**1.    Dr. E. Cooper, M.D.**

State agency physician Dr. Cooper reviewed Plaintiff's medical records on September 16, 2013, and prepared a physical residual functional capacity ("RFC") assessment. Dr. Cooper reached the same conclusions as Dr. Benrazavi and found that Plaintiff could: lift and carry 50 pounds occasionally, and 25 pounds frequently; stand and walk for six hours per eight-hour workday; and sit for

---

[15] Radiculopathy is an "irritation of or injury to a nerve root (as from being compressed) that typically causes pain, numbness, or weakness in the part of the body which is supplied with nerves from that root." (See http://c.merriam-webster.com/medlineplus/radiculopathy).

six hours out of an eight-hour workday. (AR 61). Dr. Cooper further found that Plaintiff could perform all the following tasks frequently: climbing ramps, stairs, and ladders; balancing; stooping (bending at the waist); crouching (bending at the knees); kneeling; and crawling. (AR 61-62). Dr. Cooper also concluded that Plaintiff had no manipulative, visual, communicative, or environmental limitations. (AR 62). Dr. Cooper further found that with these limitations, Plaintiff could perform her past relevant work as a cashier. (AR 63). The Disability Determination Explanation bearing Dr. Cooper's signature explained:

> Your condition results in some limitations in your ability to perform work related activities. However, these limitations do not prevent you from performing work you have done in the past as a/an cashier clerk/cashier, as normally performed in the national economy. We have determined that your condition is not severe enough to keep you from working. We considered the medical and other information and work experience in determining how your condition affects your ability to work.

(Id.). Accordingly, Dr. Cooper determined that Plaintiff was not disabled. (Id.).

## 2. Dr. Eric D. Schmitter

Board certified orthopedic surgeon Dr. Eric D. Schmitter testified at Plaintiff's February 18, 2015 hearing as a neutral medical expert. (AR 26-31). Dr. Schmitter concluded, based on his review of the medical evidence, that Plaintiff had been diagnosed with "mild spondylosis of the L4 and L5 [vertabrae], and degenerative changes of the L5/S1 level. There is also mild degeneration of the lower [thoracic] spine." (AR 26). In addition, Dr. Schmitter found some evidence of "osteophytes in the lower thoracic spine," and arthritis in both hands. (AR 27). However, even when considering these impairments in combination, Dr. Schmitter did not find that they would meet or equal a listing. (Id.). Dr. Schmitter explicitly adopted the RFC by Dr. Benrazavi. (AR 28). He further testified that he did not adopt Dr. Koehler's more restrictive RFC because the "objective findings" in Plaintiff's x-ray, "which showed very mild changes," and the absence of "neurologic deficits" in the records did not support Dr. Koehler's findings. (AR 29). According to Dr. Schmitter, Plaintiff is capable, despite her impairments, of performing the "medium category" of work as reflected by Dr. Benrazavi's RFC. (Id.).

## G. **Vocational Expert's Testimony**

Vocational expert ("VE") Gail Macron testified that someone of Plaintiff's age, education, and past relevant work background who could "lift/carry 50 pounds occasionally, and 25 pounds frequently, [and] stand, walk and sit for six hours, and would have no other limitations" would be able to perform Plaintiff's past relevant work. (AR 36). Macron explained that those limitations would enable a person to perform even medium level work, and that a cashier checker, listed in the Dictionary of Occupational Titles § 211.462-014, is classified as "light exertionally." (Id.). However, Macron agreed with Plaintiff's counsel that persons who would "probably be absent more than three times a month," (AR 37), or who could sit or stand for only fifteen minutes without having to get up and change positions, (AR 38-39), would not be able to perform Plaintiff's past relevant work.

\\

\\

\\

**III.**

**THE FIVE STEP SEQUENTIAL EVALUATION PROCESS**

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[16] and that is expected to result in death or to last for a continuous period of at least twelve months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are:

(1)  Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

\\

\\

\\

---

16 Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1520, 416.910.

(2) Is the claimant's impairment severe?  If not, the
        claimant is found not disabled.  If so, proceed to
        step three.

(3) Does the claimant's impairment meet or equal one
        on the list of specific impairments described in
        20 C.F.R. Part 404, Subpart P, Appendix 1?  If so,
        the claimant is found disabled.  If not, proceed
        to step four.

(4) Is the claimant capable of performing his past
        work?  If so, the claimant is found not disabled.
        If not, proceed to step five.

(5) Is the claimant able to do any other work?  If not,
        the claimant is found disabled.  If so, the
        claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett); 20 C.F.R. §§ 404.1520(b)-404.1520(f)(1) & 416.920(b)-416.920(f)(1).

    The claimant has the burden of proof at steps one through four and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54.  If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy,

taking into account the claimant's residual functional capacity ("RFC"), age, education, and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing Tackett). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000).

### IV.

#### THE ALJ'S DECISION

On March 19, 2015, the ALJ issued a decision applying the five-step sequential evaluation process and finding that Plaintiff is not disabled within the meaning of the Social Security Act. (AR 10-17).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 3, 2013, her application date. (AR 12). At step two, the ALJ determined that Plaintiff had the severe impairments of lumbago and disorders of the back. (AR 12). At step three, the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1.  (AR 14).  With respect to Plaintiff's RFC, the ALJ determined that Plaintiff could perform medium work and could lift and/or carry up to 50 pounds occasionally and up to 25 pounds frequently; stand and/or walk for six hours in an eight-hour day; and sit for six hours in an eight-hour day.  (AR 15).  At step four, the ALJ determined that Plaintiff could perform her past relevant work and was therefore not disabled.  (AR 16-17).

In reaching this decision, the ALJ gave Dr. Koehler's RFC assessment "little, and not controlling, weight because it is unsupported by treating notes, objective tests, or the totality of the evidence."  (AR 16).  The ALJ further found Plaintiff's subjective allegations of "significant pain and functional limitation" not credible because "they are inconsistent with the very conservative medical treatment the claimant has received, and with the claimant's good physical functioning during Dr. Benrazavi's examination."  (Id.).  The ALJ similarly found the third party statement by Plaintiff's daughter to be of "little probative value" worthy of "little weight" because it merely echoed Plaintiff's "subjective complaints."  (Id.).

In contrast, the ALJ gave "significant evidentiary weight to Dr. Benrazavi's assessment, Dr. Schmitter's assessment and Dr. Cooper's assessment," and adopted the RFC assigned by Dr. Cooper. (Id.).  According to the ALJ, the "evidence of record indicates the claimant has only minimal musculoskeletal impairment, resulting in only mild limitation in functioning.  No treating source record

documents greater limitation than the claimant's good performance during Dr. Benrazavi's examination."  (Id.).

**VI.**

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  "The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  Auckland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F. 3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance."  Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)).  It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion."  Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279).  To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'"  Auckland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)).  If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner.  Reddick, 157 F.3d at 720-

21 (citing _Flaten v. Sec'y of Health & Human Servs._, 44 F.3d 1453, 1457 (9th Cir. 1995)).

**VII.**

**DISCUSSION**

Plaintiff contends that the ALJ erred by failing to consider the Medical Opinion of Dr. Koehler, Plaintiff's treating physician. (P Memo. at 2-5). The Court disagrees. For the reasons discussed below, the ALJ's decision is AFFIRMED.

## The ALJ Provided Specific And Legitimate Reasons For Giving "Little Weight" To Dr. Koehler's RFC Assessment

There are, in general, three types of medical opinions in social security cases: the opinions of (1) treating physicians who examine and treat, (2) examining physicians who examine but do not treat, and (3) non-examining physicians who neither examine nor treat. _Valentine v. Comm'r, Soc. Sec. Admin._, 574 F.3d 685, 692 (9th Cir. 2009). Treating physicians are typically given more weight because they are "employed to cure and [have] a greater opportunity to know and observe the patient as an individual." _Magallanes v. Bowen_, 881 F.2d 747, 751 (9th Cir. 1989); _Connett v. Barnhart_, 340 F.3d 871, 874 (9th Cir. 2003). Accordingly, "[a}n ALJ may reject the _uncontradicted_ medical opinion of a treating physician only for 'clear and convincing' reasons supported by substantial evidence in the record." _Holohan v. Massanari_, 246 F.3d 1195, 1202 (9th Cir. 2001) (quoting _Reddick v. Chater_, 157

F.3d 715, 725 (9th Cir. 1998) (emphasis added)). "An ALJ may rely on the medical opinion of a non-treating doctor instead of the contrary opinion of a treating doctor only if she or he provides 'specific and legitimate' reasons supported by substantial evidence in the record." Holohan, 246 F.3d at 1202 (quoting Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996) (emphasis added)).

"[T]he opinion of an examining physician is entitled to greater weight than the opinion of a nonexamining physician." Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (citing Lester, 81 F.3d at 830). Accordingly, the Commissioner may reject the controverted opinion of an examining consultative physician only for "specific and legitimate reasons that are supported by substantial evidence." Carmickle v. Comm'r of Social Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting Lester, 81 F.3d at 830-31). The opinion of a non-examining, non-treating physician does not constitute substantial evidence that justifies rejecting the opinion of either a treating or examining physician unless it is consistent with and supported by other evidence in record. Lester, 81 F.3d at 831; Morgan v. Comm'r of Soc. Sec., 169 F.3d 595, 601 (9th Cir. 1999) ("[W]e have consistently upheld the Commissioner's rejection of the opinion of a treating or examining physician, based in part on the testimony of a nontreating, nonexamining medical advisor.") (emphasis in original); 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.")

Plaintiff summarily asserts that "the ALJ failed to provide any specific and legitimate reasons for rejecting treating physician Dr. Koehler's medical opinion regarding the limitations attributable to Plaintiff's severe physical impairments." (P Memo. at 3).  According to Plaintiff, contrary to the ALJ's assertion that Dr. Koehler's RFC assessment was "'unsupported by treating notes, objective tests, or the totality of the evidence,'" the record demonstrates that "during the relevant period, Dr. Koehler consistently diagnosed Plaintiff with lower back pain and lumbago." (Id. at 3-4) (quoting AR 16).  Plaintiff further contends that Dr. Koehler "fully explained the objective basis for the functional limitations in her [August 29, 2014] medical opinion" by the references in the opinion to Plaintiff's June 11, 2013 x-ray results and Plaintiff's "limited range of motion on exam."  (P Memo. at 4).  Finally, Plaintiff argues that if the ALJ believed further clarification for Dr. Koehler's opinion was required, it was incumbent on the ALJ to seek such clarification from Dr. Koehler.  (Id.).  This Court disagrees and finds that the ALJ provided specific and legitimate reasons, amply supported by the record, for rejecting Dr. Koehler's opinion.

The ALJ's finding that Dr. Koehler's restrictive RFC assessment was unsupported by the record was "specific and legitimate."  The ALJ acknowledged that Plaintiff has a "history of back and joint pain," but noted that her June 2013 x-ray revealed only "mild degenerative disc disease" of the lumbar spine and thoracic spine.  (AR 15).  The ALJ further recognized that treating source records reflect Plaintiff's allegations of back and joint

pain, but also "reveal no clinically observed evidence of musculoskeletal impairment." (Id.). For example, the "straight leg raise" test that Dr. Koehler conducted in May 2013, just after Plaintiff applied for SSI benefits, was negative, (AR 240), as was the same test performed by Dr. Benrazavi in November 2013. (AR 275). In addition, none of the VFC records for the consults before Plaintiff filed for SSI benefits -- not even the visit the month before the filing -- reflect that Plaintiff complained of back pain at all, or list back pain/lumbago as one of Plaintiff's chronic conditions, even though Plaintiff later claimed that she had been suffering from back pain for two years by the time she applied for benefits. (AR 239, 242-51).

The ALJ also noted that Plaintiff's back pain was treated conservatively, with Ibuprofen and acupuncture. (AR 15). An ALJ may rely on evidence of conservative treatment to discredit a claimant's allegations of severe pain. See Tomasetti v. Astrue, 533 F.3d 1035, 1039-40 (9th Cir. 2008) (conservative treatment permits an inference that a claimant's reports regarding the severity of an impairment are not credible); Parra v. Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment.") (citing Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995)). Dr. Koehler recommended "conservative therapy" when Plaintiff first complained of back pain in May 2013, (AR 241), and noted in August 2014 that Plaintiff

continued to experience "improvement w/conservative therapy."[17] (AR 285). The record does not reflect that Plaintiff was ever prescribed treatment more aggressive than Ibuprofen and acupuncture, although Dr. Koehler also recommended "home exercises" and "weight loss" to treat Plaintiff's back pain. (AR 317).

The ALJ further explained why she gave "significant evidentiary weight" to the assessments of Drs. Benrazavi, Cooper, and Schmitter. (AR 15-16). The ALJ relied on Dr. Benrazavi's observation that Plaintiff was not in acute distress at the time of her consultative examination and had a full range of motion of the neck, a "good range of motion of the back," and a full, painless range of motion of the lower extremities, shoulders, elbows and wrists. (AR 15). The ALJ also explained that Dr. Benrazavi found that the osteoarthritis in Plaintiff's right and left hands was "very mild," and that Plaintiff's "motor strength was 5/5 in all extremities." (Id.). Furthermore, Dr. Benrazavi observed that Plaintiff was able to walk without an assistive device and had a normal gait. (Id.). The ALJ noted that Dr. Cooper adopted the RFC assessment by Dr. Benrazavi, and that Dr. Schmitter, in giving his testimony, cited the medical evidence of record, which showed "only mild to marginal deficits in the lumbar and thoracic spine, and degenerative changes of the hands." (AR 15-16). Notably, Dr. Schmitter testified that Plaintiff's x-rays revealed only mild

---

[17] It is notable to the Court that the only two times that Dr. Koehler recorded that Plaintiff presented with an antalgic gait were the May 2013 and August 2014 consults -- the first visit after Plaintiff applied for SSI benefits and the last visit, when Dr. Koehler was asked to complete a Medical Opinion form to support Plaintiff's SSI application. (AR 240, 285).

degeneration that was consistent with the ability to perform medium work. (AR 26-29).  See <u>Turner v. Comm'r of Soc. Sec.</u>, 613 F.3d 1217, 1223 (9th Cir. 2010) (ALJ properly relied on medical expert's testimony "that the record did not support [the claimant's] disability claim" in rejecting the treating doctor's opinion that the claimant was disabled and could not work).  The ALJ provided ample specific and legitimate reasons for rejecting Dr. Koehler's assessment.

Finally, Plaintiff's contention that the ALJ was somehow required to seek "clarification" from Dr. Koehler regarding her opinion is misplaced.  The ALJ properly considered Dr. Koehler's opinion in light of the relevant medical evidence and was able to make a decision, based on that evidence, that Plaintiff was not disabled.  The ALJ was not, in these circumstances, required to do more.  See <u>Mayes v. Massanari</u>, 276 F.3d 453, 459-60 (9th Cir. 2001) (when the record allows the ALJ to evaluate the evidence and make a disability determination, the ALJ is under no obligation to further develop the record).

In sum, the ALJ offered specific and legitimate reasons for rejecting Dr. Koehler's RFC assessment in favor of those proffered by the consultative examining physician and the non-examining physicians in finding that Plaintiff is not disabled.  Because the evidence reasonably supports affirming the ALJ's conclusion, the Court will not disturb the Commissioner's decision.  <u>Reddick</u>, 157 F.3d at 720-21.

## VII.

## CONCLUSION

    Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner. The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED:  June 8, 2017

      /S/
_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE
